NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

v.

Wayne Ray COOPER and Dixie R. Cooper, Defendants.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

v.

Jonathan SONNEBORN, Defendant.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

v.

Joseph DONADIO, M.D., Defendant.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

v.

Harold A. BERGGREN, Defendant.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

v.

Peter W. BAUER, M.D., Defendant.

William WADSWORTH, on behalf of himself and all others similarly situated, Harold A. Berggren, Peter W. Bauer, M.D., Jonathan Sonneborn, Joseph Donadio, M.D., Wayne Ray Cooper and Dixie R. Cooper, James Clark and Jane Clark, Lawrence W. Gough and Barbara E. Gough, Chester Gromala and Eleanor Gromala, George L. Bozzi and Marie R. Bozzi, Worth L. Cox and Virginia Cox, Walter A. Dommers and Evalyn A. Dommers, Richard E. Eaves and Mary Eaves, Jeanne D. Alexander, James D. Zandri and Anita M. Zandri, Walter J. Subsick, Orville R. Parks and Katherine E. Parks, Landon J. Osborn and Marcella J. Osborn, Frank J. Amadec and Annette A. Adamec, Jan Jamharian and Sara K. Jamharian, Bernie A. Kestler and Beverly C. Kestler, Jack D. Mainville and Caroline B. Mainville, Lester Maloney, Ric J. Morin and May I. Morin, Kelmer G. Oldre, Jr., and Barbara J. Oldre, Plaintiffs,

v.

Jeffrey S. SUNDERMAN, National Union Fire Insurance Company of Pittsburgh, Pa., RepublicBank, Dallas, N.A., and Arthur Andersen & Co., Defendants.

Nos. 85 Civ. 8750 (LLS) to 85 Civ. 8754 (LLS) and 86 Civ. 4220 (LLS).

United States District Court, S.D. New York.

April 18, 1989.

As Amended Jan. 19, 1990.

D'Amato & Lynch, New York City, for plaintiff Nat. Union Fire Ins. Co. of Pittsburgh, Pa.; John J. Cullen, Mitchell J. Winn and Geoffrey W. Heineman, of counsel.

Carmody & Torrance, New Haven, Conn., for defendants Cooper, Sonneborn, Donadio, Berggren, Bauer and plaintiffs Wadsworth, et al.; Anthony M. Fitzgerald, of counsel.

Stein, Zauderer, Ellenhord, Frischer & Sharp, New York City, for defendant Arthur Andersen & Co.; Bertrand C. Sellier, of counsel.

## OPINION AND ORDER

STANTON, District Judge.

National Union Fire Insurance Company of Pittsburgh ("National Union"), an issuer of financial guarantee bonds, brings the first five of these six actions (the "Note cases")[1] to enforce its indemnity agreements with limited partners in tax shelter limited partnerships, and to enforce its rights as subrogee on the limited partners' promissory notes which it honored on their behalf. National Union issued bonds which guaranteed, to the limited partnership and to the bank which financed the limited partnership, that the limited partners would make all of the capital contributions represented by their promissory notes. The limited partners stopped making their required contributions, and National Union paid on their behalf. It now seeks reimbursement, under the indemnity agreements they gave National Union at the time it guaranteed their payments, and as subrogee on the notes on which they defaulted.

In the sixth action (the "Wadsworth case"), the limited partners, in turn, sue National Union, the limited partnership's general partner (Jeffrey Sunderman), the bank which financed the limited partnership (RepublicBank Dallas, N.A.), and the limited partnership's accountants (Arthur Andersen & Co.) (collectively the "defendants")[2], seeking rescission of the offering and the indemnity agreements.

This opinion addresses: National Union's motion for summary judgment and to dismiss the affirmative defenses and counterclaims in the Note cases, and defendants' motions to dismiss the complaint, Arthur Andersen's motion for costs and fees, and plaintiffs' motion to amend the complaint in the Wadsworth case.

## BACKGROUND

In the fall of 1983 each defendant in the Note cases (the "investors") received a private placement memorandum (the "PPM") for Broken Arrow Investors, Ltd. ("Broken Arrow" or "the partnership"). The partnership was formed, and the PPM was prepared, by Jeffrey Sunderman, a syndicator of numerous other limited partnerships. Sunderman and SunWard Investments Corporation ("SunWard"), a wholly owned subsidiary of SunWise Corporation which Sunderman controlled, were the general partners of the partnership (the "general partners").[3]

As stated in the PPM, Broken Arrow's purpose was to raise capital by selling limited partnership interests in order to acquire and then rent units in an apartment complex in Phoenix, Arizona. The PPM contained a financial statement for SunWard for the fiscal year ending January 31, 1983 and two sets of annual projections: anticipated rental income and anticipated

---

1. Over 400 such cases are currently before this court in which National Union sues for reimbursement of payments it made on behalf of investors in various similar limited partnerships.

2. For purposes of this opinion the term "defendants" does not include Jeffrey Sunderman.

3. SunWard and SunWise are not named as defendants in the Wadsworth action because each filed a bankruptcy petition pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101–1174 in March 1985. (Amended Complaint, ¶ 36)

rehabilitation expenses ("deferred maintenance"). Arthur Andersen & Co. ("Arthur Andersen") issued an unqualified opinion with respect to the financial statement.

Each investor was encouraged to "consult his own counsel, accountant and other advisors as to legal, tax and related matters concerning the investment described herein and its suitability for him/her." (Exhibit D to the affidavit of J.E. Bishop, sworn to Nov. 14, 1986).

The expected return to the limited partners included income tax deductions as well as payments based upon the rental income.

William Wadsworth, the sole shareholder and president of Wadsworth Investment Co., Inc. ("WIC"), personally invested in and advised many of his clients to invest in various limited partnerships organized by the general partners. In November 1983 WIC sold Broken Arrow limited partnership interests to some of the plaintiffs in the Wadsworth case.

Those electing to become limited partners could pay for their limited partnership interests in cash, whether borrowed or their own. Or, as did all the investors, they could make a cash down payment, and sign promissory notes (the "notes") for the balance of the purchase price of their limited partnership interests.

Broken Arrow wished to obtain a loan of working capital from RepublicBank, Dallas, N.A. ("RepublicBank") in order to acquire the apartment complex. The general partners needed, and asked, National Union to supply Broken Arrow a bond which guaranteed payment by the limited partners of their notes. On November 30, 1983 National Union issued a bond in favor of Broken Arrow. On that same date Broken Arrow received a $381,900 loan from RepublicBank, having given RepublicBank the notes as security and assigned RepublicBank its rights under the bond. (RepublicBank had extended a $10 million revolving line of credit to SunWise Corporation in September 1983.) The bond included a provision waiving, as against RepublicBank,

any defenses to payment that National Union could have asserted against the partnership (the "waiver provision"). The waiver provision states "Defenses available to the Surety [i.e., National Union] against the Obligee [i.e., Broken Arrow] to deny payment of a claim under this Bond ... shall not be valid against such Permitted Assignee [i.e., RepublicBank]." The PPM did not contain a copy of the bond, but Exhibit E to the PPM lists "Loan and Surety Agreement and Closing Documents" as item 21 among the "Pertinent Documents" that would be made available to prospective investors upon request.

National Union, in its turn, required the limited partners to execute indemnity agreements whereby they agreed to reimburse National Union for any payments it made on the notes to RepublicBank on their behalf. In addition, the limited partners pledged their partnership interests as security for their obligations to National Union under the indemnity agreements.

All of the investors made their first installment payments on the notes in May 1984. But, in January 1985 Wadsworth and other investment managers travelled to Dallas, Texas to investigate the problems they had heard that SunWard and the partnership were experiencing. Wadsworth's trips to Texas, and also Arizona, continued throughout the next four months, during which time he wrote periodic letters to the investors and, along with others, formed the Due Diligence Advisory Committee "for the purpose of attempting to avoid total disaster for investors, and to get current on expenses of the partnership." (Letter dated February 2, 1985 from William F. Wadsworth to "Fellow Investor", Exhibit A to affidavit of Merle M. Martin, sworn to Apr. 29, 1987) At Wadsworth's recommendation, none of the investors made their second installment payments in May 1985. RepublicBank notified National Union of the defaults, and it paid RepublicBank on their behalf. In November 1985 National Union commenced the Note cases for reimbursement.[4]

4. National Union filed amended complaints in each of the Note cases in November 1986, add-

ing a subsequent default by each investor.

On May 28, 1986 the investors commenced the Wadsworth case. Their complaint contained nine causes of action: aiding and abetting federal securities laws violations, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (1982 and 1986 Supp.), common law fraud and misrepresentation, conversion (against only the general partners), rescission of, and construction of, the indemnity agreements (against only National Union), and violations of the Connecticut Uniform Securities laws. After RepublicBank and Arthur Andersen each filed answers and motions to dismiss the complaint, and National Union moved to dismiss the complaint in lieu of an answer, the investors filed an amended complaint on March 20, 1987. The amended complaint retains the allegations against all defendants of aiding and abetting securities law violations and common law fraud and misrepresentation, as well as those of conversion against Sunderman and rescission of the indemnity agreements against National Union, omits the allegations of violations of RICO and the Connecticut laws, and construction of the indemnity agreements, and adds allegations of common law negligence against only Arthur Andersen and rescission of the offering against only Sunderman.

In the Wadsworth case, (1) RepublicBank moves to dismiss Count One (aiding and abetting Broken Arrow's violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder) pursuant to Fed. R.Civ.P. 12(b)(6), Count Two (aiding and abetting Broken Arrow's violation of section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2)), pursuant to Fed.R.Civ.P. 56, and Count Four (common law fraud and misrepresentation) as a pendent state law claim; (2) Arthur Andersen moves for attorney's fees and costs, and to dismiss Count One pursuant to Fed.R.Civ.P. 9(b) and Counts Two, Four, and Seven (common law negligence) pursuant to Fed.R.Civ.P. 12(b)(6); (3) National Union moves to dismiss Counts One, Two, Four, and Six (rescission of the indemnity agreements) pursuant to Fed.R.Civ.P. 9(b), 12(b)(1), 12(b)(2),

and 56(b); and the investors move to amend their complaint to add a claim of negligence against Arthur Andersen.

## DISCUSSION

With respect to those portions of the motions made pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept as true the complaint's allegations and reasonable inferences therefrom. "[T]he court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1975) (footnote omitted)).

Under Fed.R.Civ.P. 56(c) the moving party in a summary judgment motion bears the burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court must "resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). However, the non-movant may not rest upon conclusory allegations or denials to defeat the motion, but rather must provide "concrete particulars" in the form of supporting facts or arguments in opposition. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984).

### I. *The Wadsworth case*

A. Section 10(b): Aiding and Abetting

In their amended complaint, the investors allege that National Union, Arthur Andersen and RepublicBank aided and abetted Sunderman's violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1983).

To establish aiding and abetting liability under the federal securities laws, the investors must prove three elements: a securities law violation by the primary party (the "primary violation"), scienter on the part of the aider and abettor, and substantial assistance by the aider and abettor in the primary violation. *IIT, an International Investment Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980); *accord Klein v. Computer Devices, Inc.*, 591 F.Supp. 270, 280, *on rehearing*, 602 F.Supp. 837 (S.D.N.Y.1985).

The primary violation consists of a misrepresentation or omission of a material fact in connection with the purchase or sale of a security, reliance upon the misrepresentation or omission to one's detriment, and scienter in making the misrepresentation or omission. *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 502 (S.D.N.Y.1987).

Case law adjusts the required degree of the aider's scienter and assistance to the primary violation according to whether the aider owed a duty of disclosure to the defrauded party. If the aider owes such a duty, recklessness suffices to establish scienter. *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.1978) (recklessness is " 'highly unreasonable' " conduct representing " 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the [aider] or so obvious that [the aider] must have been aware of it.' ") (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)), *cert. denied sub nom. Blyth, Eastman Dillon & Co. v. Rolf*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *accord Hudson v. Capital Management International, Inc.*, 565 F.Supp. 615, 624 (N.D.Cal. 1983) ("recklessness will suffice for secondary liability where defendant is under a special duty to disclose based on insider status or a fiduciary or similar relationship"). But if the aider does not owe such a duty, the aider is not liable unless it had actual knowledge of the fraud and an intent to aid and abet the wrongful act. *Monsen v. Consolidated Dressed Beef Co.,*

*Inc.*, 579 F.2d 793, 799 (3rd Cir.) ("knowledge of the underlying violation is a critical element"; "mere unknowing participation in another's violation is an improper predicate to liability"), *cert. denied sub nom. First Pennsylvania Bank, N.A. v. Monsen*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir.1975) (when no "duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter.") (citations and footnote omitted). In addition, if the alleged aider engaged only in transactions which were routine to its business, it is less likely to have acted with the requisite scienter. *Id.* ("If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability"); *accord Securities and Exchange Commission v. Washington Co. Utility District*, 676 F.2d 218, 226 (6th Cir.1982); *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. at 504 (reasonable to infer knowledge and intent from allegations of "participation in atypical financing transactions and the sale, at a discount, of promissory notes among defendants").

Where the aider's alleged substantial assistance consists of a failure to act, courts are hesitant to hold it liable absent a duty to act. *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) ("if the aider and abettor owes the plaintiff an independent duty to act or to disclose, inaction can be a proper basis for liability under the substantial assistance test"), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). *See also Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983) (inaction "ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in con-

scious and reckless violation of a duty to act.") (citation omitted); *IIT v. Cornfeld,* 619 F.2d at 927 ("Apart from a case [where inaction advances the fraud and the aider had a strong motive not to act because the fraud was benefitting him] inaction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act"; accountant "had no independent duty to see to the correction of portions of the prospectus other than the financial statement it prepared"); *Delany v. Blunt, Ellis & Loewi,* 631 F.Supp. 175, 179 (N.D.Ill.1986) ("nondisclosure does not provide the 'substantial assistance' requisite to Rule 10b–5 aiding and abetting liability without some special duty"); *Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d at 800 ("mere knowledge of a violation alone, without assistance or a duty to disclose the violation, is not an actionable wrong"); *Securities and Exchange Commission v. National Student Marketing Corp.,* 457 F.Supp. 682, 713 (D.D.C.1978).

Sunderman's fraudulent acts must first be explained to determine whether defendants aided a securities law violation. According to the investors Sunderman purchased properties on a "cluster buying" theory, i.e., "several properties would be purchased in one area, so that as the value of each individual property increased by means of rehabilitation, the value of all the properties in the area would increase by means of an improved neighborhood." (Amended Complaint, ¶ 40) Although the properties were supposed to be sold after three to five years, none ever were. Instead, when the projections for rental income were not met (because they had been set at unrealistically high levels and inadequate sums were spent on rehabilitation) and the partnerships experienced severe cash flow problems, SunWard loaned money to the partnerships to ensure their solvency and provide cash dividends to investors. Moreover, Sunderman purchased properties in excess of their market value to support his "Ponzi scheme," (*id.* at ¶ 39), a term not explained by the investors but defined as "an investment swindle in which some early investors are paid off with mon-

ey put up by later ones in order to encourage more and bigger risks." Webster's Ninth New College Dictionary 914 (1983).

Against this background, the investors contend that the PPM contained "materially false and misleading misrepresentations" including that (1) the securities were exempt from the registration requirements of the federal securities laws, (2) the financial statements overstated certain accounts receivable and funds purportedly due to SunWard from the limited partnerships and falsely inflated the income and retained earnings of SunWard by failing "to disclose the treatment and reduction of reserve accounts", and (3) the rent projections were inflated. (Amended Complaint, ¶ 58) In addition the PPM failed to disclose that (1) other "SunWard limited partnerships could not support themselves and were being financed by loans from SunWard which were unlikely of repayment" because they lacked both a positive cash flow and a net asset value, (2) the "SunWard limited partnerships purchased properties in excess of the properties' fair market value in order to obtain a financing plan favorable to Sunderman's mode of operation," (3) the viability of Sunderman and his real estate affiliates depended upon his ability to continue to syndicate real estate investments, and (4) Sunderman was "responsible for the liabilities, operation, and control of more than 80 other limited partnerships for which he lacked adequate financial assets to fulfill his duties as a general partner." (*Id.*) The investors allege that each defendant knew of these misstatements as well as Sunderman's method of "cluster buying," and reviewed and analyzed "Yellow Books" prepared by the general partners which contained financial information on SunWard partnerships. (*Id.* at ¶ 54) In addition, the amended complaint contains seven paragraphs regarding RepublicBank's aiding and abetting, ten paragraphs regarding National Union's, and seven paragraphs regarding Arthur Andersen's.

### 1. *National Union*

■ Even assuming a primary violation, National Union is not liable as an aider and

abettor unless it owed the investors a duty to disclose to them information material to the partnership. The investors contend National Union "learned of the standard operating procedures utilized by Sunderman in the acquisition and management of the properties owned by the SunWard limited partnerships, and of the financial interdependence of SunWard and the various SunWard partnerships" (Amended Complaint, ¶ 83), knew that "a significant number of SunWard limited partnerships were not performing as projected" (*Id.* at ¶ 84), would review a draft prospectus and would sometimes suggest changes for SunWard partnerships (*Id.* at ¶ 86), and "knew, as it had planned and intended, that the terms of the Bond would not be" disclosed in the PPM (*Id.* at ¶ 87), and yet did nothing to "halt Sunderman's fraud because National Union earned a premium for each Bond it issued." (*Id.* at ¶ 90)

Underlying these assertions is the concept that because National Union investigated the general partners' projects before guaranteeing the limited partners' contributions, it facilitated and is responsible for the general partners' fraud. The investors' assumption that they were entitled to rely upon National Union's own investigation, and its guaranty to the partnership that the investors would honor their notes, rests on the mistaken premise that National Union owed them a duty to disclose. Unfortunately for the investors, National Union did not undertake to furnish them the solicitude or protection which they may have expected. Rather, National Union merely agreed to cure the investors' defaults should they occur. *See In re McNeil*, 22 B.R. 408, 413 (E.D.Tenn.1982) (surety " 'undertakes to pay money or to do any other act in event that his principal fails therein' " and does not owe a duty to "disclose all material facts solely within its possession") (quoting Black's Law Dictionary 753–54 (4th ed. 1951)).

National Union had an interest in investigating the partnership to avoid becoming obligated to a stream of future payments if limited partners should default, an event which would most likely occur only if the enterprise failed and the limited partners abandoned it. The research efforts National Union expended were solely for its own purposes; it assumed no obligation to inform others of Broken Arrow's merits or infirmities. If the investors drew the conclusion that the investment would prosper from National Union's guarantee of their own promises to pay, they did so at their own risk. That conclusion may have seemed reasonable enough, but National Union owed them no duty either to investigate the partnership or to make disclosures about the investment.

Regardless of any actions National Union may have taken in assessing its own risks in guaranteeing the notes, its duty to the investors is defined by its agreements with them, the bonds and the indemnity agreements. As their surety, National Union guaranteed that those who had elected to buy partnership interests would make the required capital contributions and that if they did not, National Union would make the payments on their behalf. Unless National Union misled the investors by its own actions it is not responsible for their understandings of the investment.

Comparing cases holding that the alleged aider owed and breached a duty with cases holding there was no duty breached demonstrates that National Union's review of the PPM for its own purposes did not require it to disclose any information to the investors. On the one hand are *Securities and Exchange Commission v. Washington Co. Utility District*, 676 F.2d at 224 (manager of public utility district had duty to disclose kickback from underwriter of bond); *Edward J. Mawood & Co. v. Securities and Exchange Commission*, 591 F.2d 588, 596 (10th Cir.1979) ("where brokers are obligated to investigate, the failure to do so subjects them to a holding that they acted wilfully") (citation omitted); *Klein v. Computer Devices*, 591 F.Supp. at 280 (duty breached where aider "participated in the preparation and review of the allegedly defective prospectus and ... actively promoted the sale of shares ... by, for example, orchestrating the entire transaction, placing advertisements and processing purchase orders"); *Monsen v. Consolidated*

*Dressed Beef Co., Inc.*, 579 F.2d 793 (holding bank liable for making loan to company and then demanding continuation of program where employees, without any financial information, traded earnings for unregistered subordinated promissory notes); *Morgan v. Prudential Group, Inc.*, 527 F.Supp. 957, 961 (S.D.N.Y.1981) (counsel who prepares tax opinion for prospectus has duty to investors); *Securities and Exchange Commission v. National Student Marketing Corp.*, 457 F.Supp. 682 (merging corporation's president and counsel had duty to disclose altered financial data to shareholders); *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 549 (S.D.N.Y.1977) ("when an accountant certifies a financial statement … a relationship is thus created between the accountant and those who see the statement which gives rise to certain duties of disclosure. On the basis of this representation, the accountant may be held liable under Rule 10b–5 for the preparation of false or misleading financial statement which portray an inaccurate picture for the period covered by the report.") (citations omitted).

On the other hand are *Delany v. Blunt, Ellis & Loewi*, 631 F.Supp. 175 (bank which made loan to investor in limited partnership and made separate loan to limited partnership did not have duty to inform investor of cross-default provision which allowed bank to accelerate due date on investor's loan and draw upon investor's collateral in event partnership defaulted on its loan); *Quintel Corp., N.V. v. Citibank, N.A.*, 589 F.Supp. 1235 (S.D.N.Y.1984) (dismissing complaint against limited partnership's attorney who remained silent in order to assist general partner's scheme to defraud); *Hudson v. Capital Management International, Inc.*, 565 F.Supp. at 623 (accountant, attorney, and underwriters, who did not possess inside information or knowingly participate in a fraudulent scheme, had no duty to disclose information in limited partnership prospectus); *Schlifke v. Seafirst Corp.*, [1987] Fed.Sec.L.Rep. (CCH) ¶ 93,107, at 95,443, 1987 WL 4718 ("even if [the investors] could establish that [the aider] had knowledge of material misrepresentations or omissions by [the primary violator], since [the aider] had no independent duty to assure that [the primary violator] properly transmitted all relevant information to the investors, the alleged 'nondisclosures' by [the aider] do not provide the 'substantial assistance' requisite to an aiding and abetting claim"), *aff'd*, 866 F.2d 935 (7th Cir.1989); *In re Gap Stores Litigation*, 457 F.Supp. 1135 (N.D.Cal.1978) (vice president who reviewed defective prospectus and failed to take action owed only the duty not to misrepresent facts in portion of prospectus he prepared).

Lacking a duty to disclose, National Union is not liable for aiding and abetting the primary violation unless it is shown to have known of the alleged misstatements or omissions in the PPM and to have had a "conscious and specific motivation for not acting." *IIT v. Cornfeld*, 619 F.2d at 927; *accord Wright v. Schock*, 571 F.Supp. 642, 663 (N.D.Cal.1983) ("Missing here is any evidence that the banks and title companies sought some benefit to themselves from the consummation of [the] alleged fraud, which might convert silence and inaction into substantial assistance"), *aff'd*, 742 F.2d 541 (9th Cir.1984). No such evidence is proffered.

Nor is it enough that "National Union's financial guarantee bond allowed the General Partners to obtain credit." (Amended Complaint, ¶ 89) *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d Cir.1985) ("Allegations of a 'but for' causal relationship are insufficient" for aiding and abetting liability) (citing *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980)); *Delany v. Blunt, Ellis & Loewi*, 631 F.Supp. at 181 ("mere act of extending financing does not form the basis for an implication of the 'substantial assistance' required for aiding and abetting liability") (citation omitted). Since National Union had no duty to disclose any information to the investors, it cannot be held liable for the partnership's failure to disclose.

## 2. RepublicBank

■ According to the investors, RepublicBank reviewed the Broken Arrow PPM and knew of its misstatements (Amended Complaint, ¶ 70), "learned that a significant number of SunWard limited partnerships were not performing as projected and were throwing off significant negative cash flows," (*Id.* at ¶ 71), "was well aware of the standard operating procedures utilized by Sunderman," and knew that its loans to the general partners were "extremely risky," (*Id.* at ¶ 67), but extended them a line of credit anyway because the bonds issued by National Union "would insulate it from any loss that might result from the failure of Sunderman's Ponzi scheme." (*Id.* at ¶ 68) The investors contend that RepublicBank provided substantial assistance to Sunderman's fraud "by virtue of its funding of Sunderman's syndications." (*Id.* at ¶ 73)

Like National Union, RepublicBank did not owe the investors a duty to disclose any information it may have received about Broken Arrow or other SunWard partnerships. Whatever reviews or analyses it performed were only for its own benefit. The investors' allegations with respect to RepublicBank's knowledge of the primary violation do not satisfy the scienter requirement, *see Schneberger v. Wheeler*, 859 F.2d 1477, 1481 (11th Cir.1988) (no duty to disclose or knowledge of fraud where evidence "shows at most that [bank which made loans to limited partnership] knew about [the latter's] shaky financial situation"). Moreover, they have not met the substantial assistance requirement. As discussed above, allegations of "but for" causation will not suffice for aiding and abetting liability. *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 947–48 (7th Cir.1989); *Bane v. Sigmundr Exploration Corp.*, 848 F.2d 579, 582 (5th Cir.1988) ("routine extension of a loan does not amount to substantial assistance"); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d at 63 (citing *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980)); *Delany v. Blunt, Ellis & Loewi*, 631 F.Supp. at 181.

## 3. Arthur Andersen

The investors contend that Arthur Andersen is liable as an aider because in auditing SunWard's books and records and issuing an unqualified opinion with respect to SunWard's financial statements, it learned of and assisted the general partners' fraud. They assert that Arthur Andersen knew that "limited partnership syndications were not financially viable by reason of their structure and the manner by which their finances were conducted by Sunderman" (Amended Complaint, ¶ 75), "recognized that the Sunward management's estimation of the collectibility of accounts receivable was unreasonable" and that "the SunWard limited partnerships were unlikely to be financially capable of repaying the indebtedness" (*Id.* at ¶ 79), and that "[i]nformation had come to Andersen's attention that raised a substantial doubt regarding SunWard's ability to continue in existence." (*Id.*) The amended complaint also alleges specific auditing standards Arthur Andersen thereby violated.

■ Arthur Andersen argues that the complaint fails to comply with Fed.R.Civ.P. 9(b) because it "improperly lumps together all of the defendants" rather than setting forth the acts attributable to each (Arthur Andersen & Co.'s Memorandum of Law in Support of Motion to Dismiss, p. 16), does not allege facts which show Arthur Andersen substantially assisted the fraud (*id.* at 19–21), fails to allege intent which is required because Arthur Andersen did not owe the investors a duty (*id.* at 22), merely alleges that the financial statements were "inaccurate in some unspecified manner" and fails to "identify any auditing standard or accounting principle allegedly violated" (*id.* at 23, 24), and crucial portions are alleged upon information and belief. (*Id.* at 27). Arthur Andersen does not address the changes made in the amended complaint.

Despite the initial complaint's infirmities, the amended complaint satisfies Fed.R. Civ.P. 9(b). It identifies the document in which the misrepresentations were made

and shows how the investors were misled. *See Decker v. Massey–Ferguson, Ltd.,* 534 F.Supp. 873, 877–79 (S.D.N.Y.1981); *Morgan v. Prudential Group, Inc.,* 81 F.R.D. 418, 423 n. 2 (S.D.N.Y.1978). The amended complaint, as required, delineates the acts attributable to each defendant, *Goldman v. Belden,* 754 F.2d 1059, 1069–70 (2d Cir. 1985), and with respect to Arthur Andersen adequately alleges the nature of the misrepresentations in the financial statements and specifies the accounting principles allegedly violated. *Decker v. Massey–Ferguson, Ltd.,* 534 F.Supp at 882–83. While the amended complaint alleges a few matters upon information and belief, these are supported by other facts.

■ Finally, since Rule 9(b) allows that "intent, knowledge, and other condition of mind of a person may be averred generally," "great specificity [is] not required with respect to the allegations of knowledge and scienter." *Goldman v. Belden,* 754 F.2d at 1070. The amended complaint's allegations that Arthur Andersen acted with knowledge or out of recklessness satisfies Rule 9(b). Notwithstanding Arthur Andersen's assertions to the contrary, an accountant who prepares or reviews financial statements for inclusion in a prospectus does owe a duty to those who foreseeably read and rely on the statements. *See Oleck v. Fischer,* 623 F.2d 791 (2d Cir.1980); *IIT v. Cornfeld,* 619 F.2d at 927 ("Accountants do have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying."); *Bozsi Ltd. Partnership v. Lynott,* 676 F.Supp. 505 (S.D.N.Y.1987) (finding allegation of recklessness sufficient where accountant prepared and certified financial statements); *Mishkin v. Peat, Marwick, Mitchell & Co.,* 658 F.Supp. 271, 273 (S.D.N.Y. 1987) ("One charged with the specific responsibility of a competent professional audit cannot relieve himself of liability by shutting his eyes to what was plainly to be seen"); *Fund of Funds v. Arthur Andersen & Co.,* 545 F.Supp. 1314, 1356 (S.D.N.Y.1982) (apply recklessness standard to "accountants whose audit or opinion letter is allegedly misleading, in an action by

third parties whose reliance upon such pronouncements is foreseeable") (citation omitted); *Resnick v. Touche Ross & Co.,* 470 F.Supp. 1020 (S.D.N.Y.1979); *In re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litigation,* 467 F.Supp. 227, 255 (W.D.Tex.1979) (auditor, acting with scienter, who certifies financial statement which states amounts accurately but conveys an inaccurate overall picture of company's financial condition liable); *cf. In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. at 505 ("an accounting firm has no duty to disclose fraudulent misconduct and may not be adjudged as an aider and abettor under Section 10(b) where it has not given some representation or certification, such as an opinion or certified statement, or has not invited the public to rely on the firm's financial judgment at that time") (citing *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040 (11th Cir.1986) (finding duty of disclosure where accountant prepared financial statement for prospectus), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069 (N.D.Cal.1979) (accounting firm which did not prepare any part of prospectus under no duty to disclose company's fraudulent activity).

**B. Section 12(2): Aiding and Abetting**

The investors allege that defendants aided and abetted the general partners' violation of section 12(2) of the Securities Act of 1933 for reasons nearly identical to their section 10(b) claim, and because the limited partnership interests were securities which should have been registered. Defendants urge dismissal of this claim, arguing that it is barred under the applicable one-year statute of limitations, 15 U.S.C. § 77m:

> No action shall be maintained to enforce any liability created under ... section 12(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence ...

Thus, if the investors discovered or should have discovered the general partners'

wrongdoing before May 28, 1985, they are barred under the statute of limitations.

According to defendants, Wadsworth's activities and those of the committee he formed from January through April 1985 put the investors on inquiry notice of the alleged fraud:

> [The] evidence shows that in early 1985 Wadsworth was "probing" what was already known to be the deteriorated financial condition of SunWard, Sunderman, Broken Arrow and other of Sunderman's limited partnerships. He also advised plaintiffs that a Due Diligence Advisory Committee (the "Committee") of investment brokers had been formed and that its purpose was to "determin[e] the financial condition of SunWard, ... [Sunderman], and the.... partnerships." In addition, plaintiffs were notified that a SunWard Investors Committee (the "SIC"), chaired by Wadsworth, had been organized to "investigate the ... partnerships and decide what action, if any, [was] necessary to protect the Limited Partner interests"
>
> In connection with the Committee's investigation, Wadsworth monitored activities at SunWard, reviewed documents at SunWard's offices, and the Committee took "joint control over receipts and disbursements." Wadsworth also testified that the Committee hired an accountant who worked with SunWard's in-house accountants to prepare reports on each limited partnership. The accountant's reports, which Wadsworth reviewed in February 1985, showed that at least 95 of 107 limited partnerships, including Broken Arrow, had a cumulative negative cash flow.... These reports also contained data such as the amounts payable to SunWard from each partnership, mortgages outstanding, occupancy rates, amounts due on investor notes and the equity owned by various limited partnerships.

(Reply Memorandum of RepublicBank, p. 25–27) (footnotes and citations omitted). In addition to correspondence from the SIC and the Committee, and a complaint, filed by Wadsworth and others in the United States District Court for the District of Arizona on March 15, 1985, for an accounting, appointment of a receiver, and injunction against the general partners and Broken Arrow, defendants submit five letters, dated February 2, 1985 through May 18, 1985, from Wadsworth to investors in SunWard partnerships informing them that he was "devoting all my time to the SunWard problems" and providing ongoing status reports. (Exhibits to affidavit of Merle M. Martin, sworn to Apr. 29, 1987)

The investors argue that without access to the Yellow Books and other specific documents, "[t]he only way for plaintiffs to have learned of the fraud would have been through an admission by one of the SunWise or SunWard executives.... [P]laintiffs did not obtain such an admission until May 1, 1986, during a telephone conversation between Mr. Wadsworth and Jack Heilbron, SunWard's former director of marketing." (Investors' Memorandum, p. 48)

However, the case law does not require such glaring evidence of fraud:

> It is of no moment that he may not have known as many of the details of his claim or of [defendant's] involvement with Black Watch as he later acquired. The reasonable diligence standard requires a plaintiff to pursue his claim when "the possibility of fraud should have been apparent." *Klein v. Shields & Co.*, 470 F.2d 1344, 1347 (2d Cir.1972). The period begins to run at the point at which a plaintiff has enough facts to be on inquiry notice of a potential claim; it does not wait until he has full knowledge of the eventual particulars of his case.

*Ingenito v. Bermec Corp.*, 441 F.Supp. at 554–55 (citation omitted). Given the intensity of Wadsworth's and the Committee's investigation of SunWard and the information each rapidly acquired, Wadsworth had enough facts to know of the investors' potential claim before May 28, 1985.

Accordingly, Count Two of the amended complaint must fail.

### C. Common Law Fraud and Misrepresentation

In their fourth count, the investors allege that defendants aided and abetted the gen-

eral partners' fraudulent conduct, statements, and misrepresentations. (Amended Complaint, ¶ 115–121).

A district court may exercise jurisdiction over pendent state claims "since the Securities Exchange Act's conferral of exclusive jurisdiction on federal courts, § 27, for violations of that act permits adjudication of all related claims only in those courts." *Weinberger v. Kendrick*, 698 F.2d 61, 76 (2d Cir.1982), *reh'g granted in part, denied in part*, [1983] Fed.Sec.L.Rep. (CCH) ¶ 99,074, *cert. denied sub nom. Lewy v. Weinberger*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

Since National Union and RepublicBank did not owe the investors a duty to disclose, the investors' allegations of common law fraud must fail as against them. *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. at 506 ("Our finding that Peat Marwick had no duty to the Abish Investors absent an affirmative representation is dispositive and mandates dismissal of ... Investors' claim of common law fraud against Peat Marwick, *see, e.g., Rush v. Oppenheimer & Co., Inc.*, 592 F.Supp. 1108, 1112 (S.D.N.Y.1984) (common law nondisclosure is actionable provided there was fiduciary relationship or duty of disclosure arising from relationship of trust and confidence)").

As to Arthur Andersen, however, the only argument it advances is lack of federal jurisdiction, based on its belief that the investors' federal securities law claims against it would be dismissed, and accordingly, its motion to dismiss Count Four is denied.

### D. Rescission or Construction of the Indemnity Agreements (National Union)

The investors contend that the indemnity agreements they signed violate the federal securities laws, public policy, and state law because they "require indemnification for payments made on the Notes pursuant to

the Bond, and the Bond provides for the waiver of defenses to the enforcement of the Notes, without plaintiffs having been given due notice of such waiver, which materially increased" their risk. (Amended Complaint, ¶ 127)

The waiver provision does not deprive the investors of any defenses they may assert against defendants. Rather, it speaks only to defenses available to National Union against RepublicBank. The investors, however, argue that they still had to indemnify National Union "even though Republic's claim under a Note might be subject to defenses." (*Id.* at ¶ 64) They complain that a copy of the bond was not included in the PPM, nor was this term disclosed to them. (*Id.*)

Since the resolution of this dispute depends, at least in part, on whether RepublicBank's not being a holder in due course affects National Union's rights under the indemnity agreements (see pages 36–38 below), National Union's motion to dismiss Count Six is denied, without prejudice to renewal.

### E. Negligence (Arthur Andersen)

█ Count Seven of the amended complaint alleges that Arthur Andersen "performed its professional duties in a careless and negligent manner." (Amended Complaint, ¶ 130)

Arthur Andersen argues that the investors should be denied permission, pursuant to Fed.R.Civ.P. 15(a), to add this count to their amended complaint because the count fails to state a claim under Missouri law.[5] The crux of Arthur Andersen's argument is that the investors were not part of the "limited group of persons for whose 'benefit and guidance' [defendant] intended to supply, directly or indirectly, its auditing/accounting reports." *Biben v. Card*, [1985] Fed.Sec.L.Rep. (CCH) ¶ 92,010 at 91,-005 (W.D.Mo.1985).

Under Missouri law, a court may "extend liability to third parties for whose benefit

---

5. The investors and Arthur Andersen agree that since Arthur Andersen answered the original complaint, the investors require leave of court to add a claim against this defendant. *See*

*Barksdale v. King*, 699 F.2d 744, 747 (5th Cir. 1983). Both also agree that the law of Missouri applies to this count.

and guidance the accountant supplies the information, or to such third persons, although not identified, who the accountant knows the recipient of the audit intends to supply such information." *Aluma Kraft Manufacturing Co. v. Elmer Fox & Co.,* 493 S.W.2d 378, 383 (Mo.Ct.App.1973); *cf. 999, a Corporation v. Cox & Co.,* 574 F.Supp. 1026, 1031 (E.D.Mo.1983) (where "allegedly negligent party does not know that plaintiff intends to rely on the information or that plaintiff is a member of a limited class of potential users", no liability).

Unlike *Biben,* which concerned a distribution of documents to the general public and a plaintiff class including all those who purchased stock on the open market over a seventeen-month period, the PPM was sent to a limited group of persons—prospective investors in a limited partnership—and Arthur Andersen knew such investors would rely upon its work.

Since allowing the investors to amend their complaint to add a claim of negligence against Arthur Andersen will not prejudice that defendant, leave is granted pursuant to Fed.R.Civ.P. 15(a).

### F. Attorney's Fees and Costs

Arthur Andersen applies for attorney's fees and costs for the time spent in preparing this motion. In light of Arthur Andersen's failure (except with respect to Count Two) to prevail on its motion to dismiss, and to argue the merits of its application for such fees and costs, its application is denied.

### II. *The Note Cases*

In seeking summary judgment in the Note cases, National Union claims that it is entitled to reimbursement under the indemnity agreements, and as subrogee of RepublicBank on the notes for the funds it paid on the investors' behalf. National Union argues that the investors have no valid defenses to the notes against RepublicBank as a holder in due course, and that it has the rights of a holder in due course as RepublicBank's transferee.

The investors do not contest that they signed the notes and indemnity agreements. They argue, however, that neither RepublicBank nor National Union is a holder in due course because the notes were nonnegotiable, none of the notes bears an indorsement to RepublicBank, and RepublicBank knew of the general partners' fraud. The investors also argue that National Union has no right to reimbursement under the indemnity agreements because these agreements increased the liability of the investors beyond that they assumed under the notes.

### A. RepublicBank as a Holder in Due Course

#### 1. *Negotiability*

■ The notes provide for interest at ten percent per annum before maturity, and for interest after default of "two percent (2%) above the 'prime rate' then being charged (adjusted on a monthly basis) by the RepublicBank Dallas, N.A." (Exhibit B, National Union's Amended Complaint) The investors challenge the negotiability of the notes, claiming that the amount payable is uncertain because the interest rate after a default cannot be determined without reference to the prime rate.

To be negotiable, an instrument must contain an unconditional promise or order to pay a sum certain. U.C.C. § 3–104(1)(b). Section 3–106 states that: "(1) The sum payable is a sum certain even though it is to be paid (a) with stated interest or by stated installments; or (b) with stated different rates of interest before and after default or a specified date." Official Comment to § 3–106 provides:

> It is sufficient that at any time of payment the holder is able to determine the amount then payable from the instrument itself with any necessary computation.... The computation must be one which can be made from the instrument itself without reference to any outside source, and this section does not make negotiable a note payable with interest "at the current rate."

Courts and U.C.C. commentators have agreed that an interest provision that can-

not be determined without reference to the prime rate, even if it specifies the prime rate of a particular bank, renders a note nonnegotiable, because the purchaser of the note must look beyond the face of the note to determine how much is owed on the note at the time of payment. *Taylor v. Roeder*, 234 Va. 99, 360 S.E.2d 191 (1987) (interest at "three percent (3%) over Chase Manhattan Prime to be adjusted monthly" renders note nonnegotiable); *Northern Trust Co. v. E.T. Clancy Export Co.*, 612 F.Supp. 712 (N.D.Ill.1985) (interest at ½% above prime renders a note nonnegotiable); *A. Alport & Son, Inc. v. Hotel Evans, Inc.*, 65 Misc.2d 374, 317 N.Y.S.2d 937, 939–40 (Sullivan Co. 1970) ("with interest at bank rates" renders a note nonnegotiable); 4 Hawkland, U.C.C. Series S 3–106:03 at 95 n. 5; 2 Hart & Willier, Bender's U.C.C. Series § 2.11[2] at 2–103; Leary, U.C.C. Handbook at 95.

Following the rational of *Taylor, Northern Trust,* and *Alport,* the rate of two percent above prime would render the note nonnegotiable if it applied to the entire life of the note.[6] That is not true of this note, which provides for interest at ten percent per annum before maturity, with a rate of two percent above RepublicBank's prime after a default. In *Taylor, Northern Trust,* and *Alport* the courts were construing the effect of a stated interest rate prior to maturity.

After a default, the nonnegotiablity of the note is irrelevant. "Once an instrument has matured, it no longer has its function as a money substitute and it is immaterial whether it is payable thereafter in a sum certain. No person can become a holder in due course, and it will not circulate in the business community." Hart & Willier, at 2–103 (footnote omitted). Once there has been a default on the note, no person who has notice of the default can become a holder in due course. U.C.C. § 3–302(1)(c).

---

**6.** Several commentators, including Hawkland, Hart & Willier, and Leary (all cited above), have argued that strong policy reasons exist for negotiability on a note whose rate of interest is

After a default, the note is no longer transferable except subject to the personal defenses of the maker. It is therefore irrelevant that the amount due after a default is not a sum certain. As long as the interest due can be computed from the face of the note itself at the time payment is due, it is immaterial that computation of the interest due after a default requires reference to an outside source. Since the note that the investors signed provided for a fixed ten percent rate of interest until maturity, the fact that the interest rate after default cannot be determined except by reference to the prime rate charged by RepublicBank does not render the note nonnegotiable before a default occurs. *See National Union Fire Insurance Company of Pittsburgh, Pa. v. Tegtmeier,* 673 F.Supp. 1269 (S.D.N.Y.1987).

### 2. *Endorsement*

The investors contend that since none of the notes bears an endorsement to RepublicBank, it did not take the notes by negotiation. As National Union has shown, however, the back of each note provides "PAY TO THE ORDER of RepublicBank Dallas, N.A. By ____" and is signed on the line by Jeffrey Sunderman. (Exhibit D to the reply affidavit of Mitchell J. Winn, sworn to Apr. 28, 1987) The investors do not offer any proof to the contrary.

### 3. *RepublicBank's knowledge of the general partners' fraud*

The investors assert that since RepublicBank knew of the general partners' fraud, it and National Union (as its subrogee) are subject to the investors' defenses on the notes, specifically lack of good faith and knowledge of defenses to the notes at the time of taking.

In *Chemical Bank v. Haskell,* 51 N.Y.2d 85, 432 N.Y.S.2d 478, 480, 411 N.E.2d 1339, 1341 (1980), the New York Court of Appeals stated:

> [T]he inquiry is not whether a reasonable banker in Chemical's position would have known, or would have inquired concern-

---

determined by reference to the prime rate. *See also Taylor v. Roeder,* 234 Va. 99, 360 S.E.2d 191, 195 (1987) (Compton, J., dissenting).

ing the alleged breach by [the general partner] of its partnership duties, but rather, the inquiry is what Chemical itself actually knew. If Chemical did not have actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments, then its good faith was sufficiently shown.

*See also First City Federal Savings Bank v. Bhogaonker,* 684 F.Supp. 793 (S.D.N.Y. 1988); *Sundsvallsbanken v. Fondmetal, Inc.,* 624 F.Supp. 811, 817 (S.D.N.Y.1985); *Scarsdale National Bank & Trust v. Toronto Dominion Bank,* 533 F.Supp. 378 (S.D.N.Y.1982).

J.E. Bishop, Senior Vice President of RepublicBank, states that "no Republic employee had knowledge of the existence of any fraudulent misrepresentations or omissions in Broken Arrow's prospectus or of the alleged fraud perpetrated upon plaintiffs. by Sunderman." (Affidavit of J.E. Bishop, sworn to Nov. 14, 1986, Exhibit E to Reply Affirmation of Mitchell J. Winn, Esq., sworn to Apr. 29, 1987) In contrast, paragraph 15 of the Counter Statements Pursuant to Local Rule 3(g) details the investors' assertions of RepublicBank's knowledge of Sunderman's fraud at the time the notes were negotiated to it. The investors contend that RepublicBank knew that (1) Sunderman was "technically insolvent" and building his business on a "Ponzi" scheme, (2) Broken Arrow was undercapitalized, (3) various SunWard partnerships had negative cash flows and were not meeting projections, (4) the terms of the bond were not disclosed to the investors, and (5) the proceeds of the loan RepublicBank made to Broken Arrow were used "for the furtherance of the Sunderman real estate scheme." (*Id.*)

Since the extent of RepublicBank's knowledge presents a material fact question, it cannot be resolved on a motion for summary judgment.

**B. National Union's right to indemnification**

Neither side has presented reasoned analysis or authority with respect to whether National Union is entitled to reimbursement under the indemnity agreements for payments it made to RepublicBank on the notes, assuming that as RepublicBank's subrogee (or because of its own knowledge or notice [7]) it is not a holder in due course of the notes but is subject to the limited partners' alleged defenses. Accordingly it would be premature to grant National Union summary judgment on this point, and it is denied without prejudice to a renewed application, properly supported.

**C. Affirmative Defenses and Counterclaim**

National Union also seeks dismissal of the four affirmative defenses and one counterclaim in the investors' amended answers. The first two defenses—that the notes are not negotiable instruments and that the notes were not indorsed to RepublicBank—are dismissed for the reasons stated in sections II.A.1 and II.A.2 above. National Union cannot yet prevail on its motion with respect to the third and fourth defenses—that RepublicBank knew of a possible fraud defense when it took the notes and that the waiver provision in the bond was not disclosed to the investors—for the reasons stated in sections II.A.3 and II.B above. The counterclaim consists of "[t]he allegations ... set forth in the Wadsworth Complaint." For the same reasons that National Union's motion to dismiss the Wadsworth complaint was granted, except for Count Six (for rescission or construction of the indemnity agreement), all of the counterclaim in the Note cases is dismissed, except for that portion reflecting Count Six of the Wadsworth complaint.

**CONCLUSION**

National Union's motion for summary judgment in 85 Civ. 8570 (LLS) through 85 Civ. 8574 (LLS), inclusive, is denied, except

---

**7.** National Union's own knowledge or notice may be immaterial if it was not a party to any fraud or illegality affecting the notes or was not a prior holder with notice of a defense or claim against the notes. *See* U.C.C. § 3–201(1), Official Comment 3(a).

that the first and second affirmative defenses and the above-defined portion of the counterclaim in each investor's amended answer are stricken.

In 86 Civ. 4220 (LLS): (1) National Union's motion to dismiss the amended complaint as against it is granted with respect to Counts One, Two, and Four but denied with respect to Count Six, (2) Republic-Bank's motion to dismiss the amended complaint as against it is granted in full, (3) plaintiffs' motion to amend their complaint to add a claim of negligence against Arthur Andersen is granted, and (4) Arthur Andersen's motion to dismiss the amended complaint as against it is denied except for Count Two, and its motion for attorney's fees and costs is denied.

So ordered.