**NORTHWESTERN NATIONAL INSURANCE COMPANY,**
Plaintiff–Appellee,

v.

**Robert T. BALTES, et al.,[†]**
Defendants–Appellants.

No. 93–1648.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 25, 1993.

Decided Jan. 31, 1994.

John A. Rothstein, Richard C. Ninneman (argued), Jeffrey O. Davis, Quarles & Brady, Milwaukee, WI, for plaintiff-appellee.

Robert L. Elliot (argued), Hausmann & McNally, Milwaukee, WI, Alex B. Vakula, Jon A. Titus, Titus & Brueckner, Scottsdale, AZ, David E. Lasker, Julian, Olson & Lasker, Madison, WI, for defendants-appellants.

---

† All of the original defendants except Robert and Segna Killworth appealed. Janet R. Baltes and Patricia A. Stevens dismissed their portions of the appeal in April 1993. The separate appeal (No. 93–1701) of James L. Kelly was dismissed on December 23, 1993, by agreement of the parties. On December 20, 1993, Stanley D. Schubach, Richard M. Stevens, and Harold Wales moved for dismissal under Fed.R.App.P. 42(b). This motion is granted, with the condition that these three appellants must abide by their contractual commitment to pay the costs of collection, including attorneys' fees, the subject of the final paragraph of the opinion. These three appellants are not responsible, however, for fees and other costs incurred on appeal after December 20.

Before FLAUM and EASTERBROOK, Circuit Judges, and SKINNER, District Judge.[††]

EASTERBROOK, Circuit Judge.

Investors in limited partnerships often make notes promising more money later. These notes, important to the partnerships' businesses, may be essential to the tax deductions the investors hope to reap. But investors do not always keep their promises, and they become especially balky if the business (or the tax angle) goes sour. Northwestern National Insurance Company (NNIC) issued surety bonds backing up the investors' promises for approximately 200 partnerships. With a surety behind it, the paper became saleable, and investment banks purchased some, providing extra funds to the partnerships before the notes came due. NNIC's record of collections has not been enviable, however.

This case is a cousin to *Northwestern National Insurance Co. v. Maggio*, 976 F.2d 320 (7th Cir.1992). After NNIC issued its guarantee, the partners' notes were sold to Goldman Sachs & Company. As the time for payment approached, Goldman Sachs sold the notes to NNIC at a deep discount—50% in *Maggio*, 41% in this case. The discount is a puzzle. Goldman Sachs might have worried that the investors would not pay, but it had the guarantee of NNIC and therefore should have been indifferent to the partners' wealth and dependability. Counsel informed us at oral argument, however, that NNIC was itself experiencing financial strain. Its rating in *Best* had dropped from A+ in 1983 to B+ in 1984, and by 1986–87 its rating was "Not Assigned." Stock of its parent, Armco Inc., had dropped from 23⅜ in 1984 to 4⅛ in late 1986, and Armco had stopped paying dividends. So Goldman Sachs accepted a discount, getting cash with certainty rather than retaining a claim of unknown value. NNIC weathered its troubles, but when it tried to collect from the partners it discovered that it had bought itself a welter of lawsuits.

In this case, in *Maggio*, and in similar cases pending around the country, the partners have refused to pay because, they contend, the general partners defrauded them into making their investments. (They are also steamed up because the IRS has denied them the favorable tax treatment the general partners touted.) NNIC replies that it is a holder in due course, having acquired negotiable paper from Goldman Sachs for value, in good faith, and without notice of any claims or defenses the makers may have. UCC § 3–302(a)(2). The partners rejoin that the steep discount implies notice of a problem. *Maggio* rejects that contention under Arizona law—which also governs the notes at issue in this case. Relying on *Maggio*, the district court granted summary judgment for NNIC. The partners' attempt to argue the issue as if *Maggio* had not been decided is a waste of paper; we address only the new arguments, principal among which is a contention that NNIC had actual knowledge of fraud.

The partnership in this case is the Machine Monitoring Research and Development Program, one of four partnerships David Scott established in Arizona in 1981. Each limited partnership unit cost $14,143 in cash plus two notes: a short-term note of $14,143 and a long-term note (due in 1988) of $56,571. Partners expected to take deductions based on a total investment of some $85,000 per unit. But the notes bore interest below the market rate, some investors undoubtedly had planned from the beginning not to pay the installment due in 1988, and at all events the IRS concluded in 1987 that the partnership was not a real operating business, so it did not permit the investors to take the full deductions they anticipated. NNIC did not participate in the formation of the partnership and the sale of the units in 1981—transactions that the limited partners now describe as fraudulent. It appeared on the scene in 1984 with a plan to replace the long-term notes with negotiable paper, issue surety bonds, and discount the paper, permitting the partnership to receive a cash infusion in 1984 rather than 1988. Some of the limited partners agreed, making new, negotiable notes (and in exchange receiving cash rebates of approximately 10% of their investments); other partners declined the offer. The partners who agreed are now the defen-

[††] Hon. Walter Jay Skinner, of the District of Massachusetts, sitting by designation.

dants in this collection action; the partners who declined are litigating in Arizona, free from any arguments about holder in due course.

No one contends that NNIC actually learned during 1984 about the fraud the partners say occurred in 1981. But the partners believe that Alan Esrine, who supposedly steered NNIC into the partnership surety bond business, may have known about the events of 1981 and either knew or should have discovered in 1984 that the partnership was not then in need of cash for any purpose other than to enrich the scoundrels who had suckered them into making the original investments. According to the partners, Esrine is a convicted felon barred from the securities business for life by order of the SEC; yet the partners say that Esrine was NNIC's agent, and his knowledge must be imputed to NNIC, spoiling its status as a holder in due course. NNIC denied that Esrine was its agent and denied knowing that he was bad news. This set the stage for motions for summary judgment.

■ NNIC backed up its motion with affidavits from key personnel denying knowledge of any problems in 1981 or 1984. The affidavits, if true, show that NNIC is a holder in due course. To defeat the motion the investors had to produce evidence supporting their position. They had not taken any depositions, so they needed affidavits. In lieu of an affidavit of Esrine or someone else with personal knowledge of the events, they produced an affidavit of—their lawyer! The lawyer does not claim to have any personal knowledge of the events in 1981 and 1984. Instead the affidavit was just a cover page for a sheaf of documents six inches thick, which the lawyer asked the district court to review. Invited to tour the lawyer's files without Baedeker, the judge refused and granted summary judgment for NNIC on the ground that the investors had not produced any evidence in opposition to the motion. He was entirely right to do so. See *Martz v. Union Labor Life Insurance Co.*, 757 F.2d 135, 138 (7th Cir.1985).

■ "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Fed.R.Civ.P. 56(e). The lawyer's affidavit was not made "on personal knowledge," did not set forth "facts [that] would be admissible in evidence," and did not show that the lawyer is "competent to testify to the matters stated". The attached papers were not "[s]worn or certified copies". And that is not all. Many of the attachments were pages of depositions taken in other actions, which could be used if the other actions were "between the same parties or their representatives or successors in interest", Fed.R.Civ.P. 32(a)(4), a condition that does not appear to have been met. (We use the qualifier "appear" because the lawyer did not make any effort to show the relation among the parties to the different cases.) Some of the pages from the deposition of Harold C. Recard might have been useful under Rule 32(a)(2) if Recard was an officer or managing agent of NNIC at the time of the depositions, but the lawyer's affidavit was silent on that question (and the lack of certification is an independent spoiler). Among the attachments were some letters and memoranda, none of which was authenticated; there were uncertified pages of trial transcripts in unrelated litigation, also useless, see *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir.1963); there was a complaint in another case, which is not evidence of any kind; there were a few newspaper articles about Esrine, self-authenticating but not connected in any apparent way to NNIC's knowledge of his background. Of this entire sheaf of documents only two satisfy the rules: Esrine's criminal record (authenticated), and answers to interrogatories served in this case. These documents do not establish the existence of a genuine issue of material fact. It is entirely possible that the investors *could* have established a dispute requiring a trial, but they needed real evidence. District judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the

burden on the litigants, but also because their time is scarce. Other parties, who live by the rules, have a priority claim on the judge's attention. Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won.

■ The district court entered judgment against each investor for the face amount of the note plus interest and attorneys' fees, as the notes provided, and denied the investors' request for damages against NNIC. The latter decision is beyond cavil. The investors believe that NNIC violated its duties to them by not revealing in 1984 that the partnership lacked a commercially viable project and that they were in for trouble at tax time. Had they known these things, the investors insist, they could have cut their losses (exactly how they do not say). The investors have things backwards. Debtors owe duties of disclosure to their sureties, not the other way around. *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 703–04 (7th Cir.1992); *National Union Fire Insurance Co. v. Cooper*, 729 F.Supp. 1423, 1430 (S.D.N.Y.1989); *National Union Fire Insurance Co. v. Deloach*, 708 F.Supp. 1371 (S.D.N.Y.1989). The investors' protest about the use of the contractual measure of damages has more substance.

■ If Goldman Sachs had required NNIC to make good on its surety bonds, and NNIC had paid, then NNIC would be entitled to enforce the notes to the hilt. NNIC did not pay as a surety, however. Instead it bought the notes from Goldman Sachs at a discount. Once again, the discount ordinarily would not prevent the purchaser of notes from collecting in full. A discount reflects risk of nonpayment plus delay in collection. Fear that the holder of the paper will be unable to collect does not justify putting legal obstacles in the way of collection. But put suretyship together with a discount, and things change. Many elderly cases and treatises say that a surety who buys the paper at a discount may not collect from its debtor more than the price paid to the creditor. See *Merchant's Discount Corp. v. Federal Street Corp.*, 300 Mass. 167, 14 N.E.2d 155 (1938); *Restatement of Restitution* § 80 comment a (1937); Stearns, *The Law of Suretyship* § 11.40 (5th ed. 1951). We need not assess what sense this makes in light of the risks sureties bear (why should the investors' liability go down because NNIC rather than Goldman Sachs is the plaintiff?), or even whether it is the law of Arizona, for NNIC concedes that it is not entitled to make a profit by buying from Goldman Sachs at 59¢ on the dollar and then collecting in full on the notes. The question becomes: what does the no-profit condition entail? Neither Arizona nor, so far as we can discover, any other state has addressed this question when there are multiple debtors.

NNIC paid Goldman Sachs $813,671 for $1,357,703.58 face value of notes. If all the notes had a single maker, then the proper judgment would be for $813,671 plus prejudgment interest, costs, and attorneys' fees. But there are many investors, who are not liable for each other's notes, and the district court entered a judgment quantifying the obligations of each. The investors believe that each should be liable for 59% of the amount of the note, plus interest, costs, and fees. NNIC responds that judgments reduced in this fashion, to prevent it from making a profit, will instead ensure that it loses money. To see this consider an example. Let us suppose that there are two investors, each the maker of a note for $50,000, and that the surety purchased the two together for $59,000. Suppose, too, that one of the makers is solvent and can pay $50,000, while the other is insolvent (or has hidden his assets). If the court enters judgment for $50,000 against each maker (we ignore interest, costs, and fees from here on), the surety will collect $50,000, losing $9,000 in all. If the court reduces each judgment by 41%, then the surety will collect a little less than $30,000 from the solvent obligor, losing about $30,000 all told. A judgment against each maker for the amount of the note enables the surety to collect a greater portion of the sum that it has actually paid, and the prospect of such a judgment, by enlarging net collections, makes the paper worth more in the hands of intermediate holders and, ultimately, enlarges the opportunities of the makers, who can purchase more with their paper.

The investors ask: What if both investors are solvent? Then the surety would make a profit. It is easy, however, for the judgment to provide that total collections cannot exceed the amount the surety paid for the notes. Indeed, such a provision may be implied, just as it is understood that the holder of a judgment against multiple persons jointly and severally liable for payment cannot collect more than the total of the judgment. The judgment in such a case makes each defendant liable for the whole sum and gives each one credit for payments made by every other judgment debtor. A similar process of credit is possible here, subject to the understanding that none of the investors is responsible for more than the value of his own note. NNIC could have arranged for such an outcome by buying the notes at different prices from Goldman Sachs: 100¢ on the dollar for investors believed to be solvent, 25¢ for investors whose assets were in doubt. The investors do not provide any reason to suppose that any of the makers has a personal entitlement to pay less than the amount of the note; the only rule of law at issue is one pertaining to the surety's *profit*, not any particular investor's outlay. We conclude, therefore, that a surety who has become a holder in due course is entitled to a judgment for the value of the note (plus interest, costs, and fees) but may not collect more in principal amount than it paid to purchase the notes. We affirm the judgment on the understanding that it contains this implicit limitation.

The district court's judgment includes attorneys' fees, as the notes provide. These fees have been divided among the investors according to their share of the total debt. This means that NNIC will not recover all of the fees it has expended unless it collects in full from each investor, which it is unlikely to do. Unhappy with this outcome, NNIC asks us to require the investors' attorney to indemnify it for legal expenses as a sanction for taking a frivolous appeal. There were indeed some frivolous elements in this appeal (including a few we have passed in silence), but the challenge to the quantification of the judgment was anything but frivolous. NNIC's marginal costs of meeting the other elements of the appeal were no more than those it should have expected to bear. It agreed to look to the investors for its fees, and it must do so. Under the terms of the notes, the investors must pay the attorneys' fees and other expenses NNIC incurred on this appeal. The case is remanded so that these items may be reflected in the ultimate judgment.

AFFIRMED AND REMANDED.