**BERNHARDT L.L.C., Plaintiff,**

v.

**COLLEZIONE EUROPA USA, INC., Defendant.**

**No. CIV. 101CV00957.**

United States District Court, M.D. North Carolina.

Sept. 9, 2003.

See also 2003 WL 21254634.

H. Stephen Robinson, Norwood Robinson, Robinson & Lawing, Winston–Salem, NC, for plaintiffs/counter–defendants.

Teresa Raquel Robinson, Peter Joseph Juran, Blanco Tackabery Combs & Matamoros, P.A., Winston–Salem, NC, Nicholas Mesiti, Brett M. Hutton, Heslin Rothenberg Farley & Mesiti, P.C., Albany, NY, for defendants/counter–claimants.

## MEMORANDUM OPINION

BULLOCK, District Judge.

This matter comes before the court following a bench trial which concluded on July 1, 2003. This is an action for design patent infringement between Plaintiff Bernhardt, L.L.C. ("Plaintiff") and Defendant Collezione Europa, USA, Inc. ("Collezione"). At trial the parties presented both witnesses and exhibits, as well as deposition testimony, for the court's consideration. After careful review of the exhibits and depositions, and after evaluating the testimony of witnesses by considering the witnesses' interest, if any, in the outcome of the case, the witnesses' demeanor, and the witnesses' opportunity to acquire knowledge of the facts about which they testified, and the extent to which the witnesses had been supported or contradicted by other credible evidence, the court makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure. Based on these findings and conclusions, the court will enter judgment for Defendant.

## FINDINGS OF FACT

### A. *The Parties*

1. Plaintiff Bernhardt, L.L.C., is a limited liability company that owns the intellectual property rights used by other business units in the Bernhardt family of companies. Plaintiff licenses the patents in this action to Bernhardt Furniture Company ("Bernhardt"). Plaintiff and Bernhardt, a corporation, are commonly owned businesses created under the laws of the State of North Carolina with their headquarters and principal place of business in Lenoir, North Carolina.

2. Defendant Collezione is a New Jersey corporation with its principal place of business in Englewood, New Jersey. Collezione also has a factory and showroom located in High Point, North Carolina. Collezione is in the business of importing and selling furniture generally at a lower price than many others in the industry.

### B. *Background and Claims*

3. Plaintiff brought this action on October 19, 2001, alleging that Defendant Collezione infringed upon six of its patents which claim ornamental designs for individual pieces of furniture, namely United States Design Patent Nos. 441,980 ("the '980 patent"); 439,770 ("the '770 patent"); 441,975 ("the '975 patent"); 441,560 ("the '560 patent"); 438,727 ("the '727 patent"); and 439,763 ("the '763 patent") (collectively referred to as "the Patents in Suit").

4. Accused of infringing in this action are the Collezione B2200–500, –600, –660 poster beds; the D2200–100 side and end dining chairs; the D2200–2101B buffet; the D2200–2105 cabinet; and the D2200–4686 dining table. Collezione also showed and offered for sale a metal bed as part of the 2200 collection, but this piece was not subsequently put into production. Collezione denies that the pieces in its 2200 line of furniture infringe on the Patents in Suit.

5. Collezione first introduced its 2200 line of furniture that Plaintiff accuses of infringing the Patents in Suit during the April 2000 International Home Furnishings Market in High Point, North Carolina. At that time, none of the Patents in Suit had been issued by the Patent and Trademark Office ("PTO").

6. Collezione contends that the '980 patent, the '770 patent, the '975 patent, and the '560 patent are invalid because of the "public use" of these designs at Bernhardt's September 1999 "Pre–Market," showing more than one year before the filing dates of these patents.

7. A *Markman* hearing was held on April 22, 2003. Following this hearing, the court construed each patent's claim in an opinion filed on May 30, 2003.

## C. *The Patents in Suit*

8. The '980 patent was issued on May 15, 2001, from an application filed October 13, 2000. The patent names D. Scott Coley and Thomas M. McDaniel ("Coley and McDaniel") as inventors and Plaintiff as assignee. The '980 patent protects the ornamental design for a poster bed.

9. The '770 patent was issued on April 3, 2001, from an application filed October 10, 2000, and names Coley and McDaniel as inventors and Plaintiff as assignee. The '770 patent protects the ornamental design for a dining table.

10. The '975 patent was issued on May 15, 2001, from an application filed October 12, 2000, and names Coley and McDaniel as inventors and Plaintiff as assignee. The '975 patent protects the ornamental design for a dining chair.

11. The '727 patent was issued on March 13, 2001, from an application filed August 11, 2000, and names Coley and McDaniel as inventors and Plaintiff as assignee. The '727 patent protects the ornamental design for a buffet.

12. The '763 patent was issued on April 3, 2001, from an application filed July 13, 2000, and names Coley and McDaniel as inventors and Plaintiff as assignee. The '763 patent protects the ornamental design for a cabinet.

13. The '560 patent was issued on May 8, 2001, from an application filed October 13, 2000, and names Coley and McDaniel as inventors and Plaintiff as assignee. The '560 patent protects the ornamental design for a metal bed.

## D. *Creation of the Patented Designs*

14. The furniture designs claimed by the Patents in Suit were created by Coley and McDaniel. In designing furniture, Coley and McDaniel research past furniture designs for inspiration. In introducing designs to Bernhardt, Coley and McDaniel prepare initial design sketches, seek the approval of these designs from Bernhardt, prepare color renderings of the sketches, and participate in the review of mock-ups and prototypes.

15. After the furniture designs are approved by Bernhardt, engineering drawings and mock-ups or samples of the furniture are made. On the engineering drawings, changes made to the furniture designs are listed in a title block.

## E. *Marketing Practices of Bernhardt*

16. Bernhardt participates in the International Home Furnishing Market ("Market") held in High Point, North Carolina, in April and October of each year.

17. A month before Market, Bernhardt showcases its new designs to its key customers and representatives from the newspaper *Furniture Today* during what it calls a "Pre–Market." Pre–Market is held at the same showroom where Market is held. Shortly before and during Pre–Market, Bernhardt prepares and maintains an invitation list of the customers and other people invited to Pre–Market.

18. In preparation for Pre–Market, Bernhardt also creates a document listing the furniture it wants to show at Pre–Market.

19. During Pre–Market, Bernhardt showcases its new designs, either in the form of mock-ups, prototypes, drawings, or other exemplars of furniture, in its High Point showroom to its customers. Only representative pieces, not the entire collection, are shown at Pre–Market and those

that are shown may sometimes be different from the final designs ultimately introduced at Market.

20. Also during Pre–Market, Bernhardt collects comments from its customers concerning the furniture shown. These comments are included in a document prepared by Bernhardt's Senior Case-goods Designer, Linda McLean, entitled "Pre–Market Wrap-up."

21. Pre–Market is used by Bernhardt to demonstrate the concepts of the groups they are working on and to get an indication of how favorably its customers view the concept of the group shown. Bernhardt also uses Pre–Market to "bait the hook" for its customers in order to increase demand at Market.

22. Although the customers invited to Pre–Market can discuss general prices for the furniture shown with the sales representatives of Bernhardt in the showroom, firm prices are generally not known at that time.

23. To get into Pre–Market, a person must first present identification or be checked against a list of invitees while in the lobby of the building. He or she is then escorted through the building to the showroom by security. At the entrance to the showroom, the person's information is again checked. Then the person is met by a sale representative of Bernhardt and is escorted around the showroom. Customers are not allowed to take anything into the showroom or to take pictures.

24. Customers or newspaper representatives who attend Pre–Market are not required to sign a confidentiality agreement restricting disclosure of what they witnessed or learned at Pre–Market.

F. *Introduction of the Patented Designs at Pre–Market*

25. Bernhardt, as licensee of the Patents in Suit from Plaintiff, sells furniture embodying the designs of the Patents in Suit in its "Coronado Collection" of furniture.

26. Bernhardt assigns a "stock keeping unit" ("SKU") number to each of these designs. The first three digits of a SKU identify the group or collection (*e.g.*, 355 for the Coronado Collection) and the last three digits identify the type of piece (*e.g.*, a poster bed or an end chair). A SKU number is assigned to the designer's initial sketch of a piece early in the design process and it follows the design through all subsequent re-designs as long as it continues to be the same piece.

27. The bed design corresponding to the '980 patent was assigned SKUs 355–457, –458, –459. The table design corresponding to the '770 patent was originally assigned SKU 355–224 and later assigned SKUs 355–223(top) and –224 (base). The dining room chairs corresponding to the '975 patent were assigned SKUs 355–542 (side chair) and –541 (arm chair). The bed design corresponding to the '560 patent was assigned SKUs 355–467 and –469.

28. The Coronado Collection was shown by Bernhardt at the 1999 Market held in High Point, North Carolina, in October 1999.

29. The Coronado Collection was also shown to sixty-nine of Bernhardt's key customers and representatives from the newspaper *Furniture Today* during Bernhardt's Pre–Market showing on September 13–15, 1999 ("1999 Pre–Market"), about a month before the October 1999 Market. Therefore, the 1999 Pre–Market was held more than one year prior to the filing dates for the '980 patent, the '770 patent, the '975 patent, and the '560 patent.

30. Less than a month before the 1999 Pre–Market, Bernhardt prepared an "October '99 Pre–Market List", which listed

the items in its Coronado Collection it wanted to show at the 1999 Pre–Market. This list included SKUs for the furniture corresponding to the designs claimed in the '980 patent, the '770 patent, the '975 patent, and the '560 patent.

31. Frequently, the furniture on the October '99 Pre–Market List has notations or comments following their SKUs. For example, there are comments for each SKU number corresponding to the version of the furniture which was to be shown. If Bernhardt anticipated that a particular furniture piece was not going to be ready in time, it would note this next to the SKU on this list as: "may arrive late" or "new if here." "New" next to an item could mean either that a design change was needed or that the piece had not been seen or made before. "Existing" next to an item meant that the sample had been made before.

32. All of the comments collected from customers concerning the furniture in the Coronado Collection which was shown at the 1999 Pre–Market were included on a "Pre–Market Wrap-up" document authored by Linda McLean. This document brings together all outstanding issues, notes, and comments on new collections that need to be addressed before Market. This "Pre–Market Wrap-up" references the SKUs corresponding to the furniture embodying the designs claimed in the '980 patent, the '770 patent and the '975 patent. Based on the inclusion of these comments on this list, Linda McLean, called as an adverse witness by Collezione, reluctantly confirmed at trial that these three designs were likely shown to customers at the 1999 Pre–Market.

33. Although some changes were made to the designs after the 1999 Pre–Market, none of these changes were substantial. The changes that are referenced in the "Pre–Market Wrap-up" and in the title block of the engineering drawings for the furniture designs of the '980 patent, the '770 patent, the '975 patent, and the '560 patent were minor or engineer-oriented. No major revisions were made to these furniture designs based on the comments on the "Pre–Market Wrap-up" for the 1999 Pre–Market.

34. The furniture embodying the designs claimed in the '980 patent, the '770 patent, the '975 patent, and the '560 patent was shown at the 1999 Pre–Market held by Bernhardt.

### G. The Accused Products and the Patented Designs

#### The '980 Patent

35. The '980 Patent–in–Suit is drawn to an ornamental design for a poster bed.

36. Collezione sold poster beds that are accused of infringing the '980 patent in three sizes, each of which has its own model number: the B2200–500 (queen), B2200–600 (California king), and B2200–660 (king). These three models were essentially identical in appearance and different only in dimension.

37. Collezione contends that it does not infringe the '980 patent because its B2200 poster beds do not appropriate several of Plaintiff's alleged points of novelty of the '980 patent.

38. Plaintiff offered no evidence at trial of the points of novelty of the '980 patent other than introducing as an exhibit the prosecution history.

39. Plaintiff contends, as it did in its briefs filed prior to trial, that the design claimed by the '980 patent is distinguished from the prior art by the following points of novelty:

a. The particular shape and configuration of the serpentine cornice molding on the headboard.

b. The use of recessed panels of equal width extending from near the bottom of the headboard to a point near the top in which each panel is framed by molding which projects outward from the plane of the headboard and the recessed edges are likewise molded and in which the top of each of the three panels is shaped such that, in combination, they follow the line of the serpentine shape of the headboard.

c. The use in combination of massive rope turnings of consistent diameter throughout their length and carved acanthus leaves trailing in the grooves of the turning on the endposts of the headboard.

d. The use in combination (from top to bottom) of an acorn-shaped finial, a ring turning, a massive rope carving, another ring turning, a chamfered square length and an urn-shaped foot on the headboard endposts.

e. The use on the footboard of two rectangular recessed panels, each with its long edge horizontal, each framed by molding that extends outward from the plane of the footboard and the pattern of the molding continues inward into the recess in a similar fashion to the recessed panels on the headboard.

f. Footboard endposts using (from top to bottom) acorn-shaped finials, a ring turning, a rope turning, another ring turning, a chamfered square and an urn-shaped foot.

40. Plaintiff offered no evidence at trial as to which of its alleged points of novelty were appropriated by Collezione and how and where the alleged point of novelty appeared on Collezione's B2200–500, B2200–600, and B2200–660 poster beds.

*The '770 Patent*

41. The '770 patent claims an ornamental design for a dining table.

42. Collezione sold a dining table which is accused of infringing the '770 patent: D2200–4686.

43. Collezione contends that it does not infringe the '770 patent because its D2200–4696 dining table does not appropriate several of Plaintiff's alleged points of novelty of the '770 patent.

44. Plaintiff offered no evidence at trial of the points of novelty of the '770 patent other than introducing as an exhibit the prosecution history.

45. Plaintiff contends, as it did in its briefs filed prior to trial, that the design claimed by the '770 patent is distinguished from the prior art by the following points of novelty:

a. The use in a trestle table design of leg posts and stretchers that are each rope-turnings having a consistent and relatively large cross-section or diameter, the turnings of each stretcher having the same number of "twists" per unit of length as the legs and the stretchers being of the same diameter as the leg posts.

b. The use in combination of rope turnings, chamfered squares, and bun feet on the legs.

c. The bun foot, rope turning, and chamfered square combination used on the trestle stretchers and bases.

d. The shape of the table top, *i.e.,* a four-sided top that is roughly rectangular except that the two shorter edges at the ends of the table are a distinctive serpentine shape while the two long side edges are straight.

e. The use in combination of the foregoing table top shape with a stepped undermolding running along the entire circumference of the tabletop and visible and distinct planking on the top surface of the table.

46. Plaintiff offered no evidence at trial as to which of its alleged points of novelty were appropriated by Collezione and how and where the alleged point of novelty appeared on Collezione's D2200–4686 dining table.

*The '975 Patent*

47. The '975 patent claims an ornamental design for a dining chair.

48. Collezione sold a dining chair that is accused of infringing the '975 patent: D2200–100.

49. Collezione contends that it does not infringe the '975 patent because its D2200–100 dining chair does not appropriate several of the Plaintiff's alleged points of novelty of the '975 patent.

50. Plaintiff offered no evidence at trial of the points of novelty of the '975 patent other than introducing as an exhibit the prosecution history.

51. Plaintiff contends, as it did in its briefs filed prior to trial, that the design claimed by the '975 patent is distinguished from the prior art by the following points of novelty:

a. The serpentine shape of the top framing of the chair.

b. The use of a serpentine top framing for an upholstered chair.

c. The use of a decorative frieze on the serpentine top framing.

d. The use in combination of a serpentine top, serpentine stretchers joined by a serpentine cross rail.

e. The use in combination of a serpentine top, serpentine side stretchers, a serpentine cross rail, and the frieze on a chair generally following the Louis XV style.

52. Plaintiff offered no evidence at trial as to which of its alleged points of novelty were appropriated by Collezione and how and where the alleged point of novelty appeared on Collezione's D2200–100 dining chair.

*The '727 Patent*

53. The '727 patent claims an ornamental design for a buffet.

54. Collezione sold a buffet that is accused of infringing the '727 patent: D2200–2101B.

55. Collezione contends that it does not infringe the '727 patent because its D2200–2101B buffet does not appropriate several of Plaintiff's alleged points of novelty of its '727 patent.

56. Plaintiff offered no evidence at trial of the points of novelty of the '727 patent other than introducing as an exhibit the prosecution history.

57. Plaintiff contends, as it did in its briefs filed prior to trial, that the design claimed by the '727 patent is distinguished from the prior art by the following points of novelty:

a. The lattice work design on each of the four doors.

b. The repetition of the lattice work design on the four doors across the front of the cabinet.

c. The arrangement of doors of equal width across the front of the cabinet such that the two center doors occupy the entire width of the break front.

d. The particular shape of the break front.

e. The use in combination of a decorative frieze between the top and the doors, the break front, and the four doors of equal width.

f. The use in combination of the design elements that give the top of the buffet its characteristic shape and configuration, *i.e.,* an overhanging top having rounded corners on the front facing side and square corners on the rearward facing side, a

milled rounded edge that projects out slightly from the flat top surface running along the front and side edges, and having the central half of the outward facing long side thrusting slightly outward by means of concave projections, so as to echo and maintain the degree of overhang over the breakfront of the center of the buffet.

58. Plaintiff introduced no evidence at trial as to which of its alleged points of novelty were appropriated by Collezione and how and where the alleged point of novelty appeared on Collezione's D2200–2102B buffet.

*The '763 Patent*

59. The '763 patent claims an ornamental design for a cabinet.

60. Collezione sold a cabinet that is accused of infringing the '763 patent: D2200–2105.

61. Collezione contends that it does not infringe the '763 patent because its D2200–2105 cabinet does not appropriate several of Plaintiff's alleged points of novelty of the '763 patent.

62. Plaintiff offered no evidence at trial of the points of novelty of the '763 patent other than introducing as an exhibit the prosecution history.

63. Plaintiff contends, as it did in its briefs filed prior to trial, that the design claimed by the '763 patent is distinguished from the prior art by the following points of novelty:

a. The use in combination of a round arched top that rests, or appears to rest, on crown molding that begins at the top of each pilaster and continues back horizontally across the sides of the cabinet and a scroll-work frieze on the front of the cabinet that runs in an arc beneath the entire curve of the arch.

b. The use in combination of a scroll-work frieze on the pilasters of a domed cabinet.

c. The use of two mirror-image framed transparent doors that open outward, each of which extends to the bottom edge of the dome top and each of which is shaped such that together their tops form an arc.

d. Mullion (or muntin) on each door one third of the way from the bottom running across the transparent portion from one side of the frame to another, shaped so as to appear to form a continuous serpentine shape across the width of the two doors.

e. Decorative filigree (or lattice) work that extends from, and fills the area between, the bottom frame of the door and the mullion.

f. The use in combination of a stepped base molding that is wider at the bottom than the top (in pyramid fashion) and forms projections at each of the front facing bottom corners and carved bun feet.

64. Plaintiff offered no evidence at trial as to which of its alleged points of novelty were appropriated by Collezione and how and where the alleged point of novelty appeared on Collezione's B2200–2105 cabinet.

*The '560 Patent*

65. The '560 patent claims an ornamental design for a metal bed.

66. Collezione showed one prototype metal bed at Collezione's April 2000 Market, but this design was not put into production.

67. Collezione never imported, made, offered to sell, used, or sold any bed similar to this metal bed after Collezione's April 2000 Market.

68. Plaintiff has not offered any points of novelty for the '560 patent.

## DISCUSSION

### A. *"Public Use"*

Collezione claims that the '980 patent, the '770 patent, the '975 patent, and the '560 patent ("the Pre–Market patents") are invalid because pieces of furniture embodying these patents' designs were on display at Bernhardt's 1999 Pre–Market, thus, constituting a "public use" under Section 102(b). Under 35 U.S.C. § 102(b), a person is entitled to a patent, *inter alia*, unless "the invention was . . . in public use . . . in this country, more than one year prior to the date of the application for patent in the United States."

■ A patent carries a presumption of validity. 35 U.S.C. § 282. To overcome this presumption, Defendant must prove by clear and convincing evidence that the patent is invalid. *Minnesota Mining and Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed.Cir.2002). Clear and convincing evidence is that evidence which produces "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984). "The burden of proving invalidity always remains with the party asserting invalidity; the burden never shifts to the patentee." *Harrington Mfg. Co., Inc. v. Powell Mfg. Co.*, 815 F.2d 1478, 1482 (Fed. Cir.1986).

### 1. *Display at 1999 Pre–Market*

■ Collezione claims that there is clear and convincing evidence that furniture embodying the Pre–Market patents' designs were on display during the 1999 Pre–Market. First, it is undisputed that pieces of the Coronado Collection were on display at the 1999 Pre–Market. Next, Collezione points to the fact that the SKUs which correspond to four of the patents were included on the October '99 Pre–Market List. Collezione claims that the Bernhardt poster bed (SKU 355–459) is similar to the bed shown in the '980 patent; the Bernhardt dining table (SKU 355–224) is similar to the dining table shown in the '770 patent; the Bernhardt chairs (SKUs 355–541 and –542) are similar to the side and arm chair designs, respectively, shown in the '975 patent; and the Bernhardt metal bed (SKU 355–469) is similar to the bed shown in the '560 patent. (*See* Hutton Ex. D, R. Collett at 18, line 24, through p. 22, line 1.) Even Plaintiff's witnesses have testified that it is assumed that a piece's inclusion on the October '99 Pre–Market List means that the piece would be shown at Pre–Market. (*See, e.g.*, Hutton Ex. C, W. Collett at 24, line 17 through p. 25, line 14, and p. 28, lines 13–18; Hutton Ex. F, L. McLean at 83, line 24 through p. 84, line 1.) Moreover, Collezione points out that the notation of "(new)" next to a piece listed on the October '99 Pre–Market List does not mean that the piece was not there. As William Collett, Bernhardt's Vice President of Residential Case Goods Merchandising, testified, "new" could mean *either* that the piece was needing a design change or that the piece was simply something new that had never been made before by Bernhardt. Collezione also points out that the Pre–Market Wrap-up contains comments on three of the four SKUs corresponding to the Pre–Market patents (*e.g.*, "–541 side chair—increase ht. to 44″," "finish was inconsistent –224 [dining table] base was light," and "need to photograph 459 [poster bed] with finials to show at market"). Because many of these comments have to do with small physical changes, Collezione contends that these comments must have come from customers during the 1999 Pre–Market. Lastly, Collezione points to the lack of any conflicting evidence by Plaintiff. As Collezione notes, not one of Plaintiff's witnesses has come

forward to state that this furniture was not, in fact, at the 1999 Pre–Market.

Plaintiff argues that this evidence adds up to nothing more than a possibility that a particular piece of the Coronado Collection was shown at the 1999 Pre–Market. Plaintiff first claims that the October '99 Pre–Market List was simply a "wish list" of items it hoped to have for Pre–Market and that being included on the list did not mean that the piece was actually shown at Pre–Market. Plaintiff also claims that the notation "(new)" next to a particular SKU could have meant that the piece was not ready for Pre–Market because it may have needed design changes. Plaintiff further contends that the Pre–Market Wrap-up is not only a compilation of comments by Pre–Market invitees or customers, but is a document created after the 1999 Pre–Market that brought together all comments, issues, and notes on all new collections. Linda McLean, who created the list, testified that the Pre–Market Wrap-up contains comments and notes gathered from different sources from before and during the 1999 Pre–Market and that inclusion in the Pre–Market Wrap-up does not necessarily mean that the piece was actually shown at the 1999 Pre–Market. Thus, Plaintiff avers that just because there is a comment about a particular SKU on the Pre–Market Wrap-up does not necessarily mean that a piece of that type was actually shown at the 1999 Pre–Market. Lastly, Plaintiff notes that Defendant has produced no testimony from any witnesses that have personal knowledge that the Pre–Market patents' designs were actually on display at the 1999 Pre–Market.

After considering the evidence and weighing the credibility of the witnesses, the court believes that Collezione has proven that it is highly probable that the furniture designs for the four SKUs corresponding to the Pre–Market patents were shown at the 1999 Pre–Market. Although Plaintiff has claimed that inclusion on either the October '99 Pre–Market List or the Pre–Market Wrap-up does not necessarily mean that a particular piece was actually shown at the 1999 Pre–Market, this possibility is insufficient to overcome Collezione's evidence, which consists of the testimony of Plaintiff's own employees and Plaintiff's own internal documents that indicate the four items were shown.

2. *Similarity between SKUs and Pre–Market patents*

Even if some designs of the Coronado Collection were shown at the 1999 Pre–Market, Plaintiff claims that these designs were significantly different from the designs actually patented due to some design changes made subsequent to Pre–Market. However, after reviewing the evidence, the court believes that the designs allegedly shown at the 1999 Pre–Market were not substantially different from the designs shown in the Pre–Market patents. Although some changes were made (as shown in the title blocks of each piece's engineering drawings), none of these changes significantly affected the aesthetics of the Pre–Market patents' designs. The most major changes noted by Plaintiff related to the decision to replace the "linen fold carving" on the back of the 355–542 arm chair with upholstery (Pl.'s Trial Ex. 79) and the decision to remove the grille work and to lower the height of the 355–459 poster bed's headboard. The decision to replace the chair back design on the arm chair apparently did not carry over to the 355–541 side chair, which embodies the same '975 patent and did not have any change listed, and which was sold in similar condition as presented.

As for the 355–459 poster bed, Collett, Plaintiff's general manager for case goods, testified that the changes to the poster bed

were "significant." These decorative details did not change the overall appearance of the bed, however, and most of these changes seem to be more engineering-oriented. (*See* Hutton Ex. F., McLean at 65, line 11 through p. 66, line 14.) Also, although Collett testified that the changes to the poster bed occurred prior to the October 1999 Market, this is not evidence that these changes were made after the September 1999 Pre–Market.

### 3. *Exhibition at Pre–Market as a "public use"*

■ The Federal Circuit has defined "public use" as including "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith,* 714 F.2d 1127, 1134 (Fed.Cir.1983). "Whether a public use has occurred is a question of law." *Baxter Int'l, Inc., v. Cobe Labs., Inc.,* 88 F.3d 1054, 1058 (Fed.Cir.1996). In considering whether a particular use was a public use within the meaning of Section 102(b), the court must consider the "totality of the circumstances in conjunction with the policies underlying the public use bar." *Id.* These policies include:

(1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

*Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1198 (Fed.Cir.1994). With respect to a design patent, public use of an ornamental design occurs by its embodiment, exhibition, and observation since a design has no use other than to be displayed. *In re Mann,* 861 F.2d 1581 (Fed.Cir.1988). A display of an ornamental design directed toward "generating consumer interest in the aesthetics of the design" is considered a public use under 35 U.S.C. § 102(b). *Tone Bros.,* 28 F.3d at 1199 (discussing *In re Mann,* 861 F.2d at 1581).

Collezione contends that the display of these pieces of furniture at the 1999 Pre–Market constitutes a "public use" and effectively invalidates the four Pre–Market patents. Supporting its argument, Collezione notes that Pre–Market was open to at least sixty-nine "key" customers and at least one representative from a major furniture publication, *Furniture Today.* Also Bernhardt admits to using Pre–Market to "bait the hook" with their customers and to generate commercial interest in their new lines for Market. While Pre–Market gives key dealers an opportunity to look at upcoming furniture lines, it also gives Bernhardt the ability to gauge consumer interest in particular items and to receive feedback. Although it may not have firm prices generally, it is undisputed that "rough" prices may be discussed. Most importantly, however, Collezione points to the lack of any confidentiality agreement between the invitees and Bernhardt.

Plaintiff argues that Pre–Market is strictly an invitation-only event and not accessible to the public. Plaintiff contends that Pre–Market has tight security: identification checks at the entrance; escorting the invitee up to the entrance to the showroom where the identification is checked again; and escorting the invitees around the showroom by personal representatives of Bernhardt. Also, Plaintiff notes that invitees are not allowed to bring anything inside the showroom, including photographic equipment. Orders are not taken

at Pre–Market and firm prices are not usually given. Lastly, Plaintiff argues that a confidentiality agreement is unnecessary in their industry (and may actually be offensive) because it is understood that there is an ethical obligation not to divulge any information obtained at Pre–Market. If a person were to violate this understanding, Plaintiff claims that the person would no longer be able to obtain business from Bernhardt.

There are two cases which the court finds very instructive in deciding this issue. In *Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154 (Fed. Cir.1994), the Federal Circuit upheld the jury's finding of a "public use" when the patented item was displayed to twenty-to-thirty guests at a party hosted by the designer and developer. The court found that the designer personally demonstrated the device to some of the guests for the purpose of getting feedback on the device and that she made no efforts to conceal the device or keep it secret. *Id.* at 1159–60. Also, in *Baxter Int'l, Inc. v. Cobe Labs., Inc.*, 88 F.3d 1054 (Fed.Cir.1996), the Federal Circuit upheld a finding of a "public use" when the inventor allowed his invention to be viewed by co-workers who were under no duty of confidentiality. Although the inventor argued that the co-workers who observed the invention were under an "ethical obligation to keep it secret," the court found no evidence of this obligation and, nevertheless, held that the co-workers were under no duty to maintain the invention as confidential. *Id.* at 1058–59.

Although Bernhardt maintains that its security measures make Pre–Market inaccessible to the public, there no dispute that at least sixty-nine people, including a representative from a major publication, were invited to the 1999 Pre–Market and had open access to viewing the designs. Similar to the inventor in *Baxter*, Plaintiff has

not provided sufficient evidence that these invitees were under any discernible duty or ethical obligation to maintain what they viewed as confidential. While it may be a dubious business decision, there was little stopping these invitees from passing on what information or details they gathered at Pre–Market to the public or for their financial advantage.

Moreover, it is apparent that Bernhardt treated Pre–Market as more than a simple showcase for its goods. Much like the inventor in *Beachcombers* and in *Mann*, Bernhardt attempted to use Pre–Market to gain insight and feedback from its customers, to increase interest in its new lines of furniture, and to generate consumer interest in its new designs in order to gain a commercial advantage at Market. Accordingly, the court finds that the display of furniture embodying the designs contained in the Pre–Market patents at the 1999 Pre–Market qualifies as a "public use" under Section 102(b).

## B. *Infringement*

Patent infringement is the unauthorized making, using, importing or selling of an invention covered by a valid claim of a patent during the life of the patent. 35 U.S.C. § 271. Plaintiff has the burden of proving infringement by a preponderance of the evidence. *Hughes Aircraft v. U.S.*, 717 F.2d 1351, 1361 (Fed.Cir.1983). This burden extends to infringement under the doctrine of equivalents as well as to literal infringement. *Lemelson v. U.S.*, 752 F.2d 1538, 1547 (Fed.Cir.1985).

As in the case of utility patents, determining infringement of a design patent is a two-step process. The first step requires the court to properly construe the claim and determine its meaning and scope. *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed.Cir.1995). After the claim is construed, the second step re-

quires the trier of fact to compare the accused design to the properly construed claim. *Markman v. Westview Instruments*, 52 F.3d 967, 976 (Fed.Cir.1995) (*en banc*), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Two distinct tests must be applied by the trier of fact in determining whether a product design infringes a design patent: (1) the ordinary observer test and (2) the point of novelty test. *Unidynamics Corp. v. Automatic Prods. Int'l Ltd.*, 157 F.3d 1311, 1323 (Fed. Cir.1998). Both tests must be satisfied before a finding of infringement may be reached.

### 1. *Ordinary observer test*

First, the trier of fact must compare the patented and accused designs for overall visual similarity using the "ordinary observer" test: "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 529, 20 L.Ed. 731 (1871). The ordinary observer is a person of reasonable intelligence who is a purchaser of the actual accused product. *Goodyear Tire & Rubber Co., Inc. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1118 (Fed.Cir.1998).

Collezione argues that the ordinary observer test cannot be satisfied with regard to its alleged infringing furniture. For each piece, Collezione claims that distinct and detailed differences exist between their furniture and Bernhardt's designs created from the Patents in Suit. Plaintiff has simply invited the court to look at both parties' designs and to conclude that they are substantially similar. The court, as a fact finder, believes that it is reasonable to conclude that "an ordinary observer, giving such attention as a purchaser usually gives" could find that the "two designs are substantially the same." *Gorham*, 81 U.S. at 528. However, more must be shown to prove patent infringement.

### 2. *Point of novelty test*

For there to be an infringement, "the accused design must [also] appropriate the novel ornamental features of the patented design [or 'points of novelty'] that distinguish it from the prior art." *Elmer*, 67 F.3d at 1577 (citation omitted). "The points of novelty relate to differences from prior designs, and are usually determinable based on the prosecution history." *Goodyear*, 162 F.3d at 1118.

Throughout this case, the parties have disagreed on when and how the court should determine points of novelty. Collezione has maintained that determination of the points of novelty is part of the court's duty to construe the claims and may be accomplished using extrinsic, as well as intrinsic, evidence of prior art. Plaintiff has consistently argued that ascertaining the points of novelty for the Patents in Suit was not part of claim construction but should be left for trial when it has the opportunity to present and explain supporting intrinsic evidence. This issue was discussed extensively prior to trial.

> THE COURT: If it's not part of claim construction, what is it? Part of infringement? Part of invalidity? Or no part at all?
>
> MR. STEPHEN ROBINSON: *It is part of our burden of proof on our case in chief* would be my contention.
>
> THE COURT: To show that your design is novel?
>
> MR. STEPHEN ROBINSON: No. To show that they have appropriated the things which distinguish our design from

the prior art of record in the prosecution of the patents.

(Hearing on Motions, March 10, 2003, at 15, lines 9–17 (emphasis added)). Based in part on Plaintiff's promise of evidentiary support at trial, the court declined to find points of novelty during its claim construction. In its memorandum opinion of May 30, 2003, interpreting the claims, the court made it clear that it expected a more complete record to be developed at trial by the Plaintiff to support its contentions as to the points of novelty of each of its designs and evidence as to how Collezione appropriated those same points of novelty in its models of furniture—accepting as true Plaintiff's contention at the *Markman* hearing that such showing was part of its burden of proof in its case-in-chief at trial.

During trial, however, Plaintiff failed to fulfill its promise. After introducing the patents and prosecution history into evidence, Plaintiff declined to put on any testimony, expert or otherwise, to explain its proposed points of novelty. Plaintiff also declined to attempt to educate the court with any evidence or testimony analyzing or comparing its proposed points of novelty with Collezione's alleged infringing pieces of furniture.

The court understands that design patent infringement is a difficult and confusing area of law. This is made even more difficult and confusing, however, when the party with the burden of proof does little or nothing at trial to assist the court and prove its case. As one court has said, "[d]istrict judges are not archaeologists. They need not excavate masses of paper in search of revealing tidbits—not only because the rules of procedure place the burden on the litigants, but also because their time is scarce." *Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 662–63 (7th Cir.1994). As a result of Plaintiff's lack of proof, the court finds that Plaintiff has failed to prove that Collezione has appropriated the novel ornamental features of the Patents in Suit.

## CONCLUSIONS OF LAW

### Public Use

1. The 1999 Pre–Market was held by Bernhardt more than one year prior to the filing date of the applications for the '980 patent, the '770 patent, the '975 patent, and the '560 patent.

2. Collezione has proven it is highly probable that furniture embodying the same or similar designs as the '980 patent, the '770 patent, the '975 patent, and the '560 patent were on display at the 1999 Pre–Market.

3. The 1999 Pre–Market was an event accessible to the public and was used by Bernhardt to gain a commercial advantage. Thus, the display of any furniture embodying the Patents in Suit's designs at the 1999 Pre–Market constitutes a public use under 35 U.S.C. § 102(b).

4. Collezione has proven by clear and convincing evidence that the '980 patent, the '770 patent, the '975 patent, and the '560 patent are invalid under 35 U.S.C. § 102(b).

### Design Patent Infringement

5. Each of Collezione's accused designs have substantially the same overall visual appearance as the designs embodied in the Patents in Suit such that an ordinary observer, giving such attention as a purchase usually gives, would be deceived into purchasing one supposing it to be the other.

6. Plaintiff has offered no evidence and consequently has not satisfied its burden of proof with regard to the point of novelty test, that is, Plaintiff has not proven by a preponderance of the evidence that Collezione's accused designs have appropriated

the points of novelty of the designs embodied in the Patents in Suit.

A judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### JUDGMENT

For the reasons set out in the court's findings of fact and conclusions of law contained in the memorandum opinion filed contemporaneously herewith, Plaintiff has failed to prove that Defendant has infringed United States Design Patent Numbers 441,980; 439,770; 441,975; 441,-560; 438,727; and 439,763; and judgment is hereby entered on behalf of Defendant on all of Plaintiff's claims, and this action is **DISMISSED** with prejudice.